347 P.2d 764

Harvey W. **JOHNSON**, Claimant-Appellant,

v.

**EMPLOYMENT SECURITY AGENCY,**
Respondent.

No. 8792.

Supreme Court of Idaho.

Dec. 11, 1959.

James W. Ingalls, Coeur d'Alene, for appellant.

Frank L. Benson, Atty. Gen., John L. Long and Thomas Y. Gwilliam, Asst. Atty. Gen., John W. Gunn, Sp. Asst. Atty. Gen., for respondent.

KNUDSON, Justice.

Appellant, who at the time here involved was sixty-eight years of age, had been employed by the Northwest Timber Company (hereinafter referred to as Company) at Coeur d'Alene as a planer feeder for more than eight years. On about July 28, 1958 the planer mill where appellant had been working was destroyed by fire as a result of which he became unemployed. Soon

after the fire the Company leased a planer mill in Spokane, Washington and the employees who had worked in the mill which burned were given the opportunity to work in the leased plant. The leased plant is thirty-four miles distant from Coeur d'Alene where appellant lives. Appellant was notified on August 6th that he would be given an opportunity to work as a planer feeder at the leased plant commencing the following day, August 7th. Appellant testified that the principal reason he did not then go to work was that the foreman under whom he had been and would be working told him that he could not handle the job. Other reasons given by appellant were that it was rougher than what he had been doing; that it would require him to put in an eleven-hour day and the travel would be tiring; that the car which he had was not adequate to provide his transportation and that he would be put to considerable expense in providing such. Some days later (the date is uncertain) the foreman again talked with appellant about work at the Spokane plant. Shortly thereafter appellant consulted the plant superintendent who informed him that work was not available and stated that they planned to lay off some men.

Appellant applied for unemployment benefits on August 1, 1958 and was granted benefits beginning August 3, 1958 and received $40 for the week ending August 9, 1958. On August 18, 1958 the Company wrote the Employment Security Agency requesting a redetermination of appellant's application upon the ground that the Company had offered appellant work to commence August 7, 1958. Appellant's benefit payments were thereupon stopped. Thereafter appellant requested a hearing before the Appeals Examiner who found that appellant failed to accept suitable employment and denied benefits. The Examiner further directed repayment by appellant of the $40 received by him for the week ending August 9th. Request for a review by the Industrial Accident Board was regularly filed by appellant following which a hearing was had and said Board thereafter adopted the findings of fact as found by the Appeals Examiner and affirmed his order denying benefits and directing refund of the $40 payment. This appeal is from such order of the Industrial Accident Board.

One of the statutes of our state which is particularly applicable to the question here presented is I.C. § 72–1366, the particularly pertinent provisions of which are as follows:

"Personal eligibility conditions.—The personal eligibility conditions of a benefit claimant are that—* * *

"(e) During the whole of any week with respect to which he claims benefits or credit to his waiting period he was able to work, available for suitable work, and seeking work; * * *

"(h) His unemployment is not due to his failure without good cause to apply for available suitable work as directed by a representative of the director or to accept suitable work when offered to him or to return to his customary self-employment; * * *

"(i) In determining for the purposes of this act, whether or not work is suitable for an individual, the degree of risk involved to his health, safety, morals, his physical fitness, experience, training, past earnings, length of unemployment and prospects for obtaining local employment in his customary occupation, the distance of the work from his residence, and other pertinent factors shall be considered. No employment shall, in any event, be deemed suitable and benefits shall not be denied to any otherwise eligible individual for refusing to accept new work or to hold himself available for work under any of the following conditions:

"(1) * * *

"(2) If the wages, hours, or other conditions of the work offered are substantially less favorable to the individual than those prevailing for similar work in the locality of the work offered; * * *"

█ It is clear from Paragraph (e) above quoted that in order to be eligible for unemployment benefits a claimant must be (1) able to work, (2) available for suitable work, (3) seeking work. Applying these requirements to the instant case it must be said that appellant has met each of them.

As concerns his ability to work the evidence discloses that appellant was able to and did work for more than eight consecutive years for the Company in Coeur d'Alene immediately preceding the fire which deprived him of his employment and there is no evidence whatever that his ability to perform the work for which he was employed was ever questioned. There is no evidence in the record which could support a contention that he was not able to work.

█ Availability for work requires no more than availability for suitable work which the claimant has no good cause for refusing. See Hagadone v. Kirkpatrick, 66 Idaho 55, 154 P.2d 181. Appellant lives in a community where lumbering is one of the principal industries and there is nothing in the record which indicates that he was not at all times available for suitable work in that area. The record discloses that he endeavored to find work in that area.

As concerns "seeking work" the record shows that on the morning of the day following the fire appellant went to the mill grounds seeking work in helping with the clean-up. He also went the succeeding day but was not given work. The following is an excerpt of appellant's testimony before the Board:

"Mr. Hunter: Have you worked since July of last year? A. No, I haven't.

"Mr. Hunter: Have you looked for work? A. Yes, I did.

"Mr. Hunter: Where and when? A. I went to the Potlatch Forests, and I went out to Ohio Match, and they just laughed at me on account of my age.

"Mr. Hunter: Did you start looking for work after the fire in 1958? A. Yes, that's true, and they had me booked down at the unemployment office for planer feeder.

"Mr. Hunter: Did you report there regularly at the unemployment office? A. I certainly did."

He also testified before the Appeals Examiner:

"Q. I say, what efforts have you made other than the Northwest to find other employment? A. Oh, I asked different guys around the mills, and they said they were all filled up. Probably would have to lay off some, they said, with winter coming on. So, I haven't been able to find anything."

Since his testimony in this respect is undisputed it cannot be said that he was not seeking work.

In construing the purpose and intent of the Employment Security Act this Court in Johns v. S. H. Kress & Co., 78 Idaho 544, 307 P.2d 217, 219, said:

"The Act was clearly intended to provide benefits for those unemployed under prescribed conditions who are able and willing to work, but unable to secure suitable employment on the labor market."

In Hagadone v. Kirkpatrick, supra [66 Idaho 55, 154 P.2d 181], this Court said:

"The Unemployment Compensation Law must be liberally construed to the end that its purposes be accomplished."

See also Webster v. Potlatch Forests, Inc., 68 Idaho 1, 187 P.2d 527; In re Potlatch Forests, Inc., 72 Idaho 291, 240 P.2d 242; Mandes v. Employment Sec. Agency, 74 Idaho 23, 255 P.2d 1049.

The salient question here presented for determination is whether appellant was offered and refused suitable work and thereby became disqualified for benefits.

■ Said statute I.C. § 72–1366 directs that many factors shall be considered in determining whether or not work is suitable for an individual and in addition to the specified factors it provides "and other pertinent factors shall be considered". It is clear from this language that the legislative intent is that all factors, in order to do justice to the applicant in keeping with the spirit of the Act, shall be considered.

We shall now consider the factors which influenced appellant to decline the offered work in the Spokane plant. The record shows that promptly after receiving word that work would be available to him at the Spokane plant appellant talked with Frank Davis, the planer-mill foreman, regarding the kind and nature of the available work. In this connection appellant testified as follows:

"Q. And then it was about August 6th, Mr. Davis—August 6th you were called back to the plant? A. Well when I first went down, after I got my work slip, I went down in the evening when Davis come from Spokane, and showed him my work slip and he said, well Harvey, he said, there is kind of a mistake all around, he said. He said they had went ahead and drew names under the seniority, which I didn't know anything about, he said, until it was all done. He said, and if I was you I would just forget about going to Spokane. If I was you because you couldn't handle that job. I said, can I put that statement in to the unemployment office and he said, yes, you certainly can."

The foregoing testimony is not challenged nor denied by Mr. Davis.

The evidence discloses that at the leased plant there were two planers, one termed "number 2" and another termed "number 6". For at least two weeks after operations were commenced at said plant the number 2 machine was the only one in use. The number 6 machine was placed in use later. Appellant is corroborated by the testimony of Mr. Davis wherein he expressed his opinion of appellant's inability to operate the planer which was being used for at least the first two weeks of operation. The following is an excerpt of Mr. Davis' testimony:

"Mr. Davis: Howard, I believe there might be some misunderstanding on the planers, because on the number 2 machine we have two feeders whereas over here, you'll remember, we had one.

"Mr. Roe: Yeh.

"Mr. Davis: But on the number 6 machine there we have one feeder, and it feeds identical to the Woods here. It's a Woods. And that was the machine that we had started up after we were there for a couple of weeks.

"Examiner: That was the first one?

"Mr. Davis: Well, that was the second machine we started. We started the fast machine up. * * *

"Examiner: On. I see. With two men on it.

"Mr. Davis: * * * immediately. We had two men feeding it. And I know that he couldn't hack that machine. * * *"

It is clear from the foregoing quoted testimony of Mr. Davis that he was satisfied appellant could not do the work during at least the first two weeks of operation at the leased plant. It follows that it would be inequitable to penalize appellant for not undertaking work that his foreman knew he could not perform. The record is not clear as to just when appellant talked with Mr. Davis about the work the second time. Appellant denies that he rejected any offer of employment made by Mr. Davis during any such second conversation. Appellant explained that the principal reason why he did not try to work at the Spokane plant was that Mr. Davis told him he "couldn't handle it". Appellant is uncontradicted in his testimony that within approximately two weeks after receiving his call to work at the Spokane plant he talked with Mr. Rarick, plant superintendent, who told him there was no work available, that the planer was running only part time and that they were laying off men instead of hiring them. The evidence is convincing that the work that was available to appellant at the leased plant was substantially harder. Not only did the foreman express such an opinion but appellant talked with others who worked there and the following is an excerpt of appellant's testimony when questioned by the Appeals Examiner as to what they had to say:

"Q. If the job in Spokane would have been the same kind of job you had here, would you have taken it? A. Yes, I would have, under the circumstances.

"Q. Have you discussed this planer over at Spokane with any of the other men that worked on the job? A. Yes, they said it was nothing like we had over here.

"Q. In what way is it different? A. It is faster, in a way, and a different setup, they said. They said, I know you couldn't take it, Harvey, and take the eleven hours a day, at your age."

The following is an excerpt of Mr. Davis' remarks following a statement made by Mr. Howard Roe, labor union representative, to the effect that everything was much different at the Spokane plant, and created a harder situation for the employees, to-wit:

"Examiner: Do you agree with that, Mr. Davis?

"Mr. Davis: I'm going to have to.

"Examiner: Well, you don't have to, you know.

"Mr. Davis: It * * * well, it's not only harder for employees, it's also harder for management. We have to have a different type of management than we had."

One of the factors as provided by said I.C. § 72–1366 is "distance of the work from

his residence". The Spokane mill is thirty-four miles from Coeur d'Alene where appellant resides. It requires approximately an hour of driving time to travel that distance and upon a highway where traffic is heavy. It would necessitate that appellant spend approximately eleven hours away from his home each day. He would be called upon to put in approximately forty-four hours each month traveling almost 1,500 miles to and from work. He would not be paid for the additional time or the expense of travel. The evidence discloses that the employees who lived in Coeur d'Alene and worked at the Spokane plant provided their transportation by so-called "car pools" where one person in the pool would use his car one week and another member of the pool would use his ·car the next week, etc. Appellant testified that he had an automobile but its condition was such that it was inadequate to regularly travel such distance and would not be acceptable in a car pool. Appellant learned from one such commuter who was riding with a fellow-worker that he was paying $1 for the round trip. The record does not disclose whether appellant could have obtained transportation for that amount or not.

Among other pertinent factors involved is appellant's age. He was the oldest man working at the planer mill in Coeur d'Alene before it burned. The average age of all workers, including appellant, at said mill was between thirty-five and forty-one years. The evidence is clear that appellant's sixty-eight years has not rendered him incapable of performing his customary occupation since he had worked steadily for the preceding eight years.

The Appeals Examiner made the following findings of fact which were adopted by the Board and are not supported by the evidence:

(a) That the machine (planer) at which appellant would have had to work when he was called back to work at the leased plant was operated by two men, "whereas it is normally a one man job." Such finding is contrary to the testimony of the foreman Mr. Davis who stated that the first machine that started (machine no. 2) was the fast machine operated by two men. There is no evidence to the effect that it was ever operated by one man or that it could be so operated. The foreman stated that he knew claimant "couldn't hack that machine". The number 6 machine operated by one man was not started until two weeks later.

(b) The conclusion reached by the Appeals Examiner that "there was no question as to claimant's ability to handle the work" is not substantiated by the evidence. The only witness who expressed an opinion, aside from appellant, as to appellant's ability to handle the work was the foreman Mr. Davis who stated that he knew appellant could not handle the work when it was

first offered and that any work at the leased plant was harder for both the employees and the management.

(c) The Appeals Examiner found that: "Claimant refused both these offers because he felt he was too old to commute the thirty-four miles each way from Coeur d'Alene to Spokane and because he had no transportation of his own and would have had to ride with someone else, which would have cost him approximately $6.00 a week or $1.00 per shift". Such finding is not supported by the evidence. The first explanation given by appellant as to why he did not take the work following receipt by him of the "call back" is as follows:

"I refused the job offered me in Spokane for the following reasons. The foreman told me he didn't think I could handle the job as it is rougher than the job here. I would be gone from home about 11 hours, and at my age the travel would be tiring. My car is in no condition to go that far. It is old and will go short distances but not the 34 miles each way each day. If I rode with others it would cost $1.00 per day, which would take a sizable chunk out of my pay as well as add time gone from home. Considering all these things and the fact that the job was out of state, I did not consider the job suitable for me. I will still accept local work and if they

rebuild I expect to be called back to work here in town."

Appellant was interrogated by the Examiner as to the reason he did not accept the employment and the following is an excerpt of his testimony:

"Q. Well, now, was it that, the statement of Mr. Davis, that made you back away from it? Or was it the thought of the additional time commuting back and forth? A. No, it was what I got from him. I didn't think it was worth trying if I couldn't handle it."

(d) The Appeals Examiner found that appellant had, at the time he signed the "benefit payment order" for the week ending August 9, 1958 withheld information regarding the call back order by his former employer, and by reason of such non-disclosure appellant should refund the $40 payment he received. Such finding is exactly contradictory to the undenied testimony of appellant which is as follows:

"Q. Now, at the time that this offer was made to you, did you make that information known to the Agency here when you filed your claim for that week in which it was offered to you? A. Yes, I did."

In this connection it should be remembered that appellant testified that during his first conversation with Mr. Davis he was told by Mr. Davis that he couldn't handle the

job at the Spokane plant and that appellant asked said foreman "Can I put that statement in to the employment office" to which Mr. Davis replied "Yes, you certainly can". That conversation is undenied by Mr. Davis. There was no competent evidence before the Examiner to justify any finding or conclusion that there was a misrepresentation or non-disclosure of any material fact on the part of appellant.

Respondent cites the case of Wolfgram v. Employment Security Agency, 77 Idaho 298, 291 P.2d 279, 281 in support of its contention that appellant is ineligible for benefits since he did not give the offered job a fair trial. The wording of the decision by the Appeals Examiner indicates that he was influenced in arriving at his conclusion by the fact that the appellant did not try the offered work. In the Wolfgram case this Court held that the claimant there involved should have given the offered job a fair trial. The claimant made no investigation of the particular job offered and the record was purely conjectural as to whether the employment offered involved any risk to claimant's health and safety. This Court therein said:

"When a claimant refuses an offered job because of a fear that such job would be detrimental to his health, *without further investigation*, or *inquiry*, he is deemed ineligible for benefits, unless he first gives the job a fair trial." (Emphasis supplied.)

The facts in that case are not comparable to the facts here involved. In the instant case there is no denial that the foreman, under whom the offered work would have been carried on, told appellant during their first discussion that he (appellant) could not handle the job. It necessarily follows that if appellant could not handle the offered job it was not one of suitable work. Since appellant had worked under said foreman for several years appellant was entitled to rely upon such foreman's judgment in the matter. However, the evidence discloses that appellant also inquired of other workmen at the leased plant regarding the offered work and they, too, expressed the same view as did the foreman originally. The only witness who testified in any respect adversely to appellant was Mr. Davis and as concerns the second conversation he had with appellant regarding the work at the leased plant he at no. time stated what he in fact said to appellant, he merely testified in the negative that "I couldn't tell him (meaning appellant) that he couldn't hack the job". He did not state that he even offered appellant a job on that occasion nor did he at any time specifically deny any testimony offered by appellant.

Having concluded that the findings of fact as adopted by the Board are not sustained by competent evidence, the order of the Board is reversed and it is hereby directed to enter an order awarding unem-

ployment benefits to appellant as provided by the Unemployment Compensation Act. Costs awarded to claimant.

TAYLOR, SMITH and McQUADE, JJ., concur.

PORTER, C. J., sat at the hearing but did not participate in the decision.